**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re: | Chapter 11 |
| WOODLAND OAKS INVESTORS, LLC, | Case No. 26-11987 (SAH) |
| Debtor. | |

**SECURED CREDITOR SAPEREAN CAPITAL IV TB NOTE LENDER KD4, LLC'S**
**OBJECTION TO DEBTORS' AMENDED EMERGENCY**
<u>**MOTION FOR AUTHORITY TO USE CASH COLLATERAL**</u>

Kiran A. Phansalkar, OBA #11470
Preston M. Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
McAfee & Taft
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, OK 73102-7103
Telephone: (405) 235-9621
Email: kiran.phansalkar@mcafeetaft.com
       preston.sullivan@mcafeetaft.com
       beth.attaway@mcafeetaft.com

-and-

Nicholas A. Griebel
(*pending admission pro hac vice*)
POLSINELLI PC
7676 Forsyth Boulevard, Suite 800
St. Louis, Missouri 63105
Telephone: (314) 622-6613
Email: ngriebel@polsinelli.com
***Attorneys for Saperean Capital***
***IV TB Note Lender KD4, LLC***

67564574_1

## TABLE OF CONTENTS

The Loan Transaction ................................................................................................4

Assignment of the Loan to Lender.............................................................................5

Amendment of the Loan ............................................................................................6

The Debtors' Defaults under the Loan Documents ....................................................6

Unauthorized Encumbrances .....................................................................................7

Pre-Petition Litigation................................................................................................8

Foreclosure of the Property........................................................................................9

Post-Petition Litigation ...........................................................................................10

| | | |
|---|---|---|
| A. | The Receiver Is Already Using the Rents for the Debtors' Proposed Purposes | 11 |
| B. | The Debtors Fail to Propose Adequate Protection for their Use of Lender's Cash Collateral | 12 |
| | i. The Property Does Not Cashflow ...........................................................14 | |
| | ii. The Debtors Have No Equity Cushion in the Property.............................15 | |
| | iii. The Debtors' Proffered Replacement Liens Are Illusory .........................15 | |
| C. | The Debtors Have Already Grossly Mismanaged the Property, Resulting in Appointment of the Receiver | 18 |
| D. | Debtors' 13-Week Cash Collateral Budget Proves Lender Is Not Adequately Protected | 18 |
| E. | The Debtors Cannot Use Cash Collateral for Professional Fees | 22 |
| F. | The Interim Relief that the Debtors Seek Is Too Broad | 23 |
| G. | The Debtors' Proposed Limitations Are Overbroad | 24 |
| H. | The Budgets Do Not Adequately Segregate and Account for Cash Collateral. | 25 |
| I. | Lender Needs Clear Default Rights | 26 |
| J. | Reservation of Rights | 26 |

# TABLE OF AUTHORITIES

**Cases**

*Bankwest, N.A. v. Todd*,
    49 B.R. 633 (D. S.D. 1985) ............................................................................................ 23

*Cf. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc's, Ltd.*,
    484 U.S. 365 (1988) ....................................................................................................... 17

*In re Am. Res. Mgmt. Corp.*,
    51 B.R. 713 (Bankr. D. Utah 1985) ............................................................................... 23

*In re American Consolidated Transportation Companies, Inc.*,
    2009 WL 3571268 (Bankr. N.D. Ill. 2009) ................................................................... 14

*In re Atrium Dev. Co.*,
    159 B.R. 464 (Bankr. E.D. Va. 1993) ...................................................................... 20, 22

*In re Bryant Manor, LLC*,
    422 B.R. 278 (Bankr. D. Kan. 2010) ............................................................................. 12

*In re Buttermilk Towne Center, LLC*,
    442 B.R. 558 (B.A.P. 6th Cir. 2010) ............................................................................. 15

*In re Cadwell's Corners P'ship*,
    174 BR 744 (Bankr. N.D. Ill. 1994) .............................................................................. 15

*In re Callister*,
    15 B.R. 521 (Bankr. D. Utah 1981) ............................................................................... 17

*In re Carbone Companies, Inc.*,
    395 B.R. 631 (Bankr. N.D. Ohio 2008) ........................................................................ 13

*In re Cerrico Realty Corp.*,
    127 B.R. 319 (Bankr. E.D.N.Y. 1991) .......................................................................... 25

*In re Cha Hawaii, LLC*,
    426 B.R. 828 (Bankr. D. Haw. 2010) ........................................................................... 13

*In re Energy Partners, Ltd.*,
    409 B.R. 211 (Bankr. S.D. Tx 2009) ............................................................................. 14

*In re Gallegos Research Group Corp.*,
    193 B.R. 577 (D. Colo. 1995) .................................................................................. 15, 20

*In re Gerke*,
    634 B.R. 104 (D. Colo. 2021) ........................................................................................ 16

*In re Helionetics, Inc.*,
    70 B.R. 433 (Bankr. C.D. Cal. 1987) ............................................................................ 15

*In re Kloubec*,
    Case No. 99–02325–C, 2000 WL 150837 (Bankr. N.D. Iowa, Jan. 11, 2000) ............... 16

*In re LDN Corp.*,
    191 B.R. 320 (Bankr. E.D. Va. 1996) ...................................................................... 14, 19

*In re Martin*,
　　761 F.2d 472 (8th Cir. 1985) ................................................................................ 13

*In re McLeod*,
　　205 B.R. 76 (Bankr. E.D. Tex. 1996) ................................................................... 17

*In re O'Connor*,
　　808 F.2d 1393 (10th Cir. 1987) ........................................................................... 16

*In re Pacific Lifestyle Homes, Inc.*,
　　2009 WL 688908 (Bankr. W.D. Wash. 2009) ...................................................... 13

*In re Podzemny*,
　　No. 09-14226-J11, 2011 WL 576591 (Bankr. D.N.M. Feb. 8, 2011) ............................... 13

*In re Ranch Partners, Ltd.*,
　　146 B.R. 833 (D. Colo. 1992) ........................................................................ 22, 23

*In re Rebel Rents, Inc.*,
　　307 B.R. 171 (Bankr. C.D. Cal. 2004) ................................................................. 25

*In re Shivshankar P'ship LLC*,
　　517 B.R. 812 (Bankr. E.D. Tenn. 2014) .............................................................. 21

*In re Stearns Bldg.*,
　　1998 WL 661071 (6th Cir. 1998) ........................................................................ 15

*In re Tracy Broadcasting Corp.*,
　　696 F.3d 1051 (10th Cir. 2012) ........................................................................... 13

*In re Visicon Shareholders Trust*,
　　478 B.R. 292 (Bankr. S.D. Ohio 2012) ............................................................... 21

*Matter of Hamlin's Landing Joint Venture*,
　　77 B.R. 916 (Bankr. M.D. Fla. 1987) .................................................................. 24

*Upperman v. Kulick*,
　　No. 4:26-cv-00383-SH (N.D. Okla.) ................................................................... 11

**Statutes**

11 U.S.C. § 361 ............................................................................................................. 13

11 U.S.C. § 363(c)(2) .................................................................................................... 13

11 U.S.C. § 363(c)(4) .................................................................................................... 25

11 U.S.C. § 363(e) ........................................................................................................ 13

11 U.S.C. § 363(p) ........................................................................................................ 13

11 U.S.C. § 363(p)(1) .................................................................................................... 12

11 U.S.C. § 552(b)(1) .................................................................................................... 13

28 U.S.C. § 1930(a)(6) .................................................................................................. 21

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re: | Chapter 11 |
| WOODLAND OAKS INVESTORS, LLC, | Case No. 26-11987 (SAH) |
| Debtor. | |

**SECURED CREDITOR SAPEREAN CAPITAL IV TB NOTE LENDER KD4, LLC'S
OBJECTION TO DEBTORS' AMENDED EMERGENCY
MOTION FOR AUTHORITY TO USE CASH COLLATERAL**

COMES NOW secured creditor Saperean Capital IV TB Note Lender KD4, LLC ("**Lender**"), by and through counsel, who files this Objection (the "**Objection**") to the *Amended Emergency Motion for Authority to Use Cash Collateral* (the "**Motion**") filed by debtors Fairfax Best Living, LLC, Fairfax Investors, LLC (together, "**Fairfax Debtors**"), Woodland Oaks Best Living, LLC, and Woodland Oaks Investors, LLC (together, "**Woodland Debtors**," and collectively with Fairfax Debtors, the "**Debtors**")[1] and states in furtherance as follows:

**SUMMARY OF OBJECTION**

1.    These bankruptcy cases were improperly filed as a last-ditch effort to stop Lender's foreclosure on the Property (defined below). Indeed, these filings did not come until *after* the District Court of Oklahoma County, Oklahoma, denied the Debtors' request for a temporary restraining order to stop the sale earlier in the day.[2]  Lender does not consent to the Debtors' use

---

[1] On June 12, 2026, each of the Debtors filed separate bankruptcy petitions before this Court, as Case No. 26- 11984, Case No. 26-11985, Case No. 26-11986, and Case No. 26-11987 (collectively, the "**Petitions**"), despite each being co-obligors under the same loan transaction and co-owners of the single asset real estate that is the subject of this matter. A motion for joint administration was filed in each pending bankruptcy action on June 25, 2026. A hearing on the motion for joint administration was set for July 14, 2026. An amended motion for joint administration was filed in each pending bankruptcy action on June 25, 2026.

[2] The state court's docket entry denying the Debtors' motion for temporary restraining order is dated June 12, 2026, in a matter captioned *Saperean Capital IV TB Note Lender KD4, LLC v. Woodland Oaks Best Living, LLC, et al.*, Case No. CJ-2025-8499.

of Lender's cash collateral. Lender anticipates filing a motion to dismiss the Debtors' bankruptcy cases, and/or a motion to seek relief from the automatic stay, and all such rights of Lender are fully reserved and preserved.

2.　Lender is the owner and holder of a defaulted $60,800,000.00 commercial mortgage loan (the "**Loan**") made to the Debtors. As set forth in further detail below, the Debtors' gross mismanagement of the Property necessitated the appointment of a receiver (the "**Receiver**") to stabilize and rehabilitate the Property pending Lender's enforcement of its rights and remedies in connection with the Loan. The Debtors' request for authority to use cash collateral is inappropriate for at least three reasons: (i) Lender's cash collateral is already in the possession, custody, and control of the Receiver, where it should remain, (ii) the Debtors cannot show they have the financial and managerial ability to manage, operate, rehabilitate, stabilize, or successfully reorganize the Property, as set forth more fully in Lender's Objections to Debtors' Amended Emergency Motion for Turnover of Property (the "**Objections to Turnover**") filed concurrently herewith, and (iii) the Debtors have not proposed or provided (and they cannot propose or provide) Lender with adequate protection. This Court therefore should not permit the Debtors to use Lender's cash collateral without its consent.

3.　As will be stated below in further detail, the basis for Lender's Objection to the Motion are as follows:

- The Receiver is already using the Rents for the Debtors' proposed purposes, i.e., paying operating expenses, property maintenance, rehabilitation and improvement, and other costs associated with the Property. The significant disruption and upheaval that would be caused by divesting the Receiver of management of the Property, and returning the Property to Debtors (who completely neglected the Property and ran it into the ground), would materially injure the value of the Property to the detriment of all interested parties.

- The Debtors have not proposed (and cannot propose) adequate protection for the use of Lender's cash collateral because:

o     The Property does not cashflow. Based upon the Receiver's review of books and records maintained during the receivership, as well as the Debtors' own projections in their 13-week cash collateral Budgets (defined below), neither the Fairfax Property (defined below) or the Woodland Property (defined below) generate sufficient net operating income even to cover debt service payments owed to Lender, much less the more than the $6 million dollars' worth of capital expenditures and deferred maintenance that remains outstanding;

o     The Debtors have no equity cushion in the Property; and

o     The Debtors' proffered replacement liens are illusory in that the Debtors propose to grant Lender a replacement lien on collateral on which Lender already has a properly perfected and continuing security interest.

•     As is further stated in the Objections to Turnover, the Property was in substantial neglect and disrepair when the Receiver took over, including, among other damage, significant roof damage, non- functioning exterior lights, down units, boarded up windows, non-operational laundry facilities, deterioration of the laundry facilities, non-operational swimming pool and golf carts, significant pest and insect infestation, rodent issues, clogged sewer drains, and a leaking boiler resulting in loss of hot water for many residents.

•     The Debtors' proposed 13-week cash collateral Budgets show nothing but continuing operating deficits, depletion of cash, exclusion of major capital expenditures, and no realistic chance of generating future Rents that would be sufficient to compensate Lender for the use of cash collateral now, much less to cover Debtors' debt service obligations, fund necessary capital expenditures and deferred maintenance, and otherwise competently administer the Property.

•     The Court should not permit the Debtors to use Lender's cash collateral "to pay the fees and expenses of its professionals in the course of the Debtors' reorganization efforts."

•     The interim relief that the Debtors seek is too broad because it improperly includes not only emergency operating expenses, but also debt service, management fees, and restructuring/professional fees.

•     The Debtors' proposed limitations are overbroad. Market-standard cash collateral orders require weekly budgets and weekly variance reporting in Chapter 11 cases. The Debtors' proposed Budgets by contrast propose to provide only monthly variance reports due twenty (20) days after the close of each month, which is far too infrequent and delayed to permit Lender or the Court to adequately supervise the Debtors' use of cash collateral.

•     The Budgets do not adequately segregate and account for cash collateral because they fail to reconcile the cash collateral actually in existence as of the Petition Date

or present detailed, non-aggregated cash flow projections, which precludes Lender and this Court from accurately tracing the disposition of Lender's cash collateral.

- The Proposed Order (defined below) provides no clear rights to Lender if the Debtors breach any order authorizing use of cash collateral, which default rights would be necessary in any circumstance to adequately protect Lender.

## FACTUAL BACKGROUND

### The Loan Transaction

4. On June 1, 2022, Saperean Capital IV Originator, LLC ("**Original Lender**") made the Loan to the Debtors.

5. The Loan is evidenced by that certain Promissory Note Secured By Mortgage, dated June 1, 2022, in the original principal amount of $60,800,000.00 (as at any time amended, the "**Note**"), the makers of which are the Debtors.

6. The terms and conditions of the Loan are set forth in that certain Loan Agreement, dated as of June 1, 2022 (the "**Loan Agreement**"), executed by the Debtors.

7. The indebtedness owed under the Note is secured by that certain Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing, dated as of June 1, 2022 (as amended from time to time, the "**Mortgage**"), and recorded (i) with the County Clerk of Oklahoma County (the "**Oklahoma County Clerk**") on June 3, 2022, in Book 15175, page 1255; and (ii) with the County Clerk of Tulsa County (the "**Tulsa County Clerk**") on June 3, 2022, as Document No. 2022158173. A true and correct copy of the Mortgage is attached hereto as **Exhibit A**.

8. The Mortgage encumbers certain real property, improvements thereon, and personal property, including that certain real property located at 7142 South 92nd East Avenue, Tulsa, Oklahoma 74133 (the "**Woodland Property**") and 7801 NE 10th Street, Midwest City, Oklahoma (the "**Fairfax Property**" and together with the Woodland Property, as more fully described in the Mortgage, the "**Property**").

67564574_1                                    4

9. The Property consists of multifamily apartment complexes.

10. Pursuant to Section 3.1 of the Mortgage, the Debtors assigned to Lender all of the Debtors' right, title, and interest in and to all income generated by the Property:

> **ASSIGNMENT**. As security for the Secured Obligations, Mortgagor hereby irrevocably assigns to Mortgagee all of Mortgagor's right, title and interest in, to and under: (a) all Operating Agreements; and (b) the Rents, including, without limitation, all amounts payable and all rights and benefits accruing to Mortgagor under the Operating Agreements, including under the Leases ("**Payments**"). This is a present and absolute assignment, not an assignment for security purposes only, and Mortgagee's right to the Operating Agreements (including all Leases) and Payments is not contingent upon, and may be exercised without possession of, the Property. If Mortgagor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several with the other Mortgagors.

11. In connection with the Loan, Marc Kulick ("**Kulick**") and John Alexander Upperman ("**Upperman**," and together, jointly and severally, with Kulick, "**Guarantors**") executed that certain Guaranty Agreement (the "**Guaranty**"), pursuant to which Guarantors guaranteed, among other things, payment to Lender of the full amount of the Loan and Borrower's indebtedness and obligations under the Note, the Loan Agreement, and the other Loan Documents (as defined therein and below) upon the occurrence of any Recourse Obligation (as defined therein).

**Assignment of the Loan to Lender**

12. On June 3, 2022, Original Lender assigned the Mortgage and Loan Documents to Lender as evidenced in part by that certain Assignment of Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing and Other Underlying Loan Documents recorded in the Tulsa County Clerk records on June 6, 2022, as Document Number 2022058958, and in the Oklahoma County Clerk records on June 6, 2022, in Book 15177, page 448.

**Amendment of the Loan**

13.   On or about June 16, 2025, Lender, the Debtors, and Guarantors entered into that certain Second Amendment to Loan Agreement dated as of June 16, 2025 (the "**Second Amendment**").  Pursuant to Section 3 of the Second Amendment, the Debtors agreed to deliver on or before September 15, 2025, certain items (collectively, the "**Required Deliverables**"), including, without limitation, term sheets related to the sale of the Property and an "evergreen" irrevocable standby letter of credit in form and substance acceptable to Lender.

14.   The Note, the Loan Agreement, the Mortgage, the Guaranty, the Second Amendment, and all other documents executed in connection with, evidencing, or securing the Loan are collectively referred to herein as the "**Loan Documents**."

15.   Lender is the current owner and holder of the Loan Documents.

**The Debtors' Defaults under the Loan Documents**

16.   Pursuant to the Second Amendment, any failure by the Debtors to deliver the Required Deliverables by September 15, 2025, would, at Lender's discretion, be an immediate Event of Default under the Loan Documents.

17.   The Debtors failed to deliver the Required Deliverables by September 15, 2025.

18.   Lender therefore declared an Event of Default to have occurred under the Second Amendment and Loan Documents (the "**Existing Default**").

19.   The Existing Default authorizes Lender to foreclose the Mortgage and exercise all other rights and remedies available to Lender under the Loan Documents or at law or in equity.

20.   On or about September 19, 2025, Lender provided notice to the Debtors and Guarantors of the Debtors' Existing Default (the "**Default Notice**").

21.   The Default Notice in pertinent part notified the Debtors and Guarantors that failure to cure the Existing Default would entitle Lender immediately to enforce all rights and remedies

under the Loan Documents, at law, or in equity, without further notice or demand, and all as Lender may determine in its sole discretion, including, are not limited to, acceleration of the debt owed under the Note, appointment of a receiver to take possession of and administer the Property, and foreclosure of the Property.

22.     Because the Debtors failed to cure the Existing Default,[3] Lender elected to accelerate the debt owed with respect to the Loan, foreclose the Mortgage, and seek appointment of a receiver to take possession of and administer the Property.

23.     Section 6.2(e) of the Mortgage gives Lender the right to possess, manage and operate the Property as necessary upon the occurrence of an Event of Default.  Section 3.2 of the Mortgage likewise grants Lender the right to collect all sums which may at any time become due or payable from the Property, including all rental income generated therefrom, upon the occurrence of an Event of Default.

24.     Thus, the Debtors have no legal right to occupy the Property nor do they have any further right to collect rents and other income generated therefrom.  The Debtors also granted Lender the immediate right to have a receiver appointed to take possession of the Property and collect such rents and other income generated from the Property.

**Unauthorized Encumbrances**

25.     Further, a recent title report revealed that the Woodland Debtors executed and delivered to YSA Investments I, LLC ("**YSA**") a certain Mortgage, Assignment of Rents and Leases, Security Agreement, and Fixture Filing, dated as of October 29, 2025, and recorded with

---

[3] The specific default enumerated by Lender herein is not intended to waive other monetary or non-monetary defaults by Borrower existing under the Loan Documents.

the Tulsa County Clerk on October 31, 2025, as Document No. 2025099695 (the "**YSA Mortgage**"). A true and correct copy of the YSA Mortgage is attached hereto as **Exhibit B**.

26.     Pursuant to the YSA Mortgage, the Woodland Debtors, among other things, "GRANTED, BARGAINED, SOLD, CONVEYED, TRANSFERRED AND ASSIGNED, to [YSA], with the power of sale and right of entry and possession, all of [the Woodland Debtors'] right, title and interest, whether now owned or hereafter acquired, in the [Property]" (capitalization in original). *See* Exhibit B, at § 1.

**Pre-Petition Litigation**

27.     On November 14, 2025, Lender filed a Verified Petition against the Debtors and various lien claimants in the District Court of Oklahoma County (the "**State Court**") as Case No. CJ-2025-8499 (the "**State Court Action**"), asserting claims for breach of contract, foreclosure, and appointment of a receiver.[4]

28.     On January 22, 2026, **with the consent and agreement of the Debtors**, the State Court entered an Agreed Order of Appointment of a Receiver (which was later amended pursuant to that certain Amended Agreed Order of Appointment of Receiver entered on February 4, 2026, and referred to herein as the "**Receiver Order**"), pursuant to which the State Court appointed Scott Shefman with Friedman Real Estate Management ("**Receiver**") as receiver for the Property.

29.     Upon taking control of the Property, the Receiver discovered numerous issues with respect to the mismanagement of the Property and its severely deteriorated condition, all of which indicated the Debtors abdicated their responsibility and abandoned their duty to administer and operate the Property, including, without limitation, millions of dollars' worth of deferred

---

[4] Lender filed a First Amended Verified Petition in the State Court Action on March 4, 2026, to assert additional claims for breach of the Guaranty against Guarantors.

maintenance. *See* Declaration of Scott Shefman (the "**Shefman Declaration**"), at ¶ 7, attached to Lender's Objections to Turnover as **Exhibit D**.

30.     These conditions included the following: significant roof damage, non- functioning exterior lights, down units and boarded up windows, non-operational laundry facilities, deterioration of the laundry facilities, non-operational swimming pool and golf carts, significant pest and insect infestation, rodent issues, clogged sewer drains, and a leaking boiler resulting in loss of hot water for many residents. Shefman Decl., at ¶¶ 8-9. The Property also lacked an onsite management and leasing team and had no maintenance staff. Shefman Decl., at ¶ 10. Further, there were material delinquencies in gas, electric, and water/sewer bills requiring immediate payments by the Receiver to avoid service interruptions. *Id.*

31.     As more thoroughly reflected in the Objections to Turnover, the Debtors were grossly derelict in their administration and management of the Property, with numerous units unfit to rent as well as multiple critical property-level issues that endanger the overall viability of the entire Property.

**Foreclosure of the Property**

32.     Thereafter, Lender proceeded with non-judicial foreclosure with respect to the Property. After canceling an earlier sale, Lender ultimately scheduled the Property to be sold at foreclosure sale scheduled for June 12, 2026 (the "**Sale**").

33.     On June 12, 2026 (the "**Petition Date**"), just minutes before the Sale was scheduled to take place, counsel for the Debtors attended the Sale and informed counsel for Lender that each of the Debtors had filed the Petitions. The Petitions were signed by Marc Kulick as "authorized signer."

67564574_1

9

34. For the reason that the Debtors did not file their Chapter 11 Petitions until exactly two minutes before the Sale, Debtors' counsel was only able to provide Lender's counsel with the apparent bankruptcy notices for two of the Debtors, via Borrowers' counsel's cellphone.

35. As such, Lender conditionally conducted the Sale announcing that in the event that it was later determined that the automatic stay was in fact in place at the time of the Sale and the Bankruptcy Proceedings had been properly filed, the Sale would be deemed rescinded. Otherwise, if the Bankruptcy Proceedings were not timely filed or were improperly filed, the results of the Sale would be upheld. Lender was the successful purchaser of the Woodland Property and the Fairfax Property at the Sale.

36. The Rents from the Property constitute Lender's cash collateral for the Loan.

**Post-Petition Litigation**

37. On June 25, 2026, Upperman filed a Verified Complaint (the "**Upperman Complaint**") against Kulick in the United States District Court for the Northern District of Oklahoma, asserting claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) and Oklahoma law. The Upperman Complaint alleges Kulick, among other things, engaged in a years-long scheme to divert investor capital and rental revenues to fund his extravagant lifestyle, while commingling and misappropriating entity funds, incurring unauthorized debt, granting unauthorized liens, obstructing access to books and records, and concealing the enterprise's deteriorating financial condition. *See* Upperman Complaint, at ¶¶ 1, 33–37, 45–54, 68–69, 91–92, 107, 119–121. The Upperman Complaint provides further evidence that this Court should decline to order turnover of the Property and instead maintain the status quo, allowing the Receiver to continue his efforts to administer, manage, operate, stabilize, rehabilitate, and improve the Property. A true and correct copy of the Upperman Complaint, as filed in the

matter *Upperman v. Kulick*, No. 4:26-cv-00383-SH (N.D. Okla.), is attached Lender's Objections to Turnover as Exhibit H.

## ARGUMENT

### A.      The Receiver Is Already Using the Rents for the Debtors' Proposed Purposes

38.      The State Court appointed the Receiver upon Lender's showing of significant, widespread damage to the Property that the Debtors allowed to occur, resulting in the accrual of mechanic's liens, unpaid utility bills, uninhabitable units, and millions of dollars in deferred maintenance obligations. Reverting to the pre-receivership status quo by returning control of the Rents to the Debtors would give the Debtors a windfall by subverting the State Court's Receiver Order, while providing no conceivable benefit to—and indeed actively harming—creditors.  It should be noted that, during the receivership, it has been Lender (not Debtors) that has been providing cash contributions to support both operations of and capital improvements to the Property.

39.      The Debtors argue "to maintain their current business operations, the Debtors need to reinvest a portion of the post-petition account collections from their business operations to pay normal operating expenses and payroll." Motion, at ₱ 6; *see also* Motion, at ₱₱ 12-13 ("For the Debtors to maintain their current business operations, the Debtors need to use the proceeds from their rent collections to pay normal operating expenses. Additionally, the Debtors have an immediate need to fund payroll expenses, property maintenance, and other overhead expenses related to the ordinary course of its business."). Setting aside that the record in the State Court Action and the findings upon which the State Court based the Receiver Order strongly suggest the Debtors were not using Rents to pay for normal operating expenses, property maintenance, or other costs associated with the Property in the first place, the Debtors' argument ignores that the Receiver is already using the Rents for precisely those purposes.

40. The Receiver Order in pertinent part authorizes the Receiver:

    a. "to make payments and disbursements, in the ordinary course of business, as may be needed and proper for the preservation of the Property," Receiver Order, at ℙ (l);

    b. "to receive and collect any and all sums held by and due and owing to Borrowers relating to the Property, whether the same are now due or hereafter become due and owing," Receiver Order, at ℙ (m); and

    c. "to pay all current and past due real estate taxes, personal property taxes and any other taxes and assessments against any of the Property," Receiver Order, at ℙ (o).

41. Because the Receiver is already using the Rents for the Debtors' proposed purposes, there is no reason to return control of Lender's cash collateral to the Debtors, whose gross mismanagement and neglect of the Property necessitated the Receiver's appointment in the first place. This Court accordingly should deny the Debtors' request for authorization to use cash collateral. *See In re Bryant Manor, LLC*, 422 B.R. 278, 292 (Bankr. D. Kan. 2010) (denying as moot debtor's motion to use cash collateral where prepetition receiver was entitled "to collect the rents and use them to fund the ongoing operation and necessary maintenance and upkeep on the property").

    **B.**     **The Debtors Fail to Propose Adequate Protection for their Use of Lender's Cash Collateral**

42. Lender further objects to the Debtors' use of its cash collateral because the Debtors' proposal fails to provide Lender with adequate protection for at least four (4) reasons: (i) the Property does not cashflow, (ii) the Debtors have no equity cushion in the Property, (iii) the Debtors' proffered replacement liens are illusory, and (iv) the Debtors have already severely mismanaged and neglected the Property. Because Lender objects, the Debtors must prove to this Court that Lender is adequately protected before it can use such cash collateral. 11 U.S.C. § 363(p)(1) ("[T]he [debtor-in-possession] has the burden of proof on the issue of adequate

protection."); *In re Podzemny*, No. 09-14226-J11, 2011 WL 576591, at *4 (Bankr. D.N.M. Feb. 8, 2011) ("The party requesting court approval to use cash collateral over a secured creditor's objection must prove there is adequate protection for that creditor.") (citing *In re Carbone Companies, Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008). Cash payments, replacement liens, and other relief that provides the "indubitable equivalent" of the collateral used may provide adequate protection. 11 U.S.C. § 361. An "equity cushion" likewise can serve as adequate protection for purposes of 11 U.S.C. § 363. *In re Podzemny*, 2011 WL 576591, at *4.

43.    Under 11 U.S.C. § 552(b)(1), a secured creditor's interest in collateral extends to the proceeds of the secured creditor's collateral to the extent the secured creditor's security instrument applies to after-acquired property and proceeds. *In re Tracy Broadcasting Corp.*, 696 F.3d 1051, 1058 (10th Cir. 2012). Section 1.1 of the Mortgage clearly provides Lender's security interest attaches to all of the Debtors' property, "whether now owned *or hereafter acquired*" (emphasis added), which includes post-petition cash proceeds of the pledged collateral pursuant to 11 U.S.C. § 552(b)(1).

44.    The Debtors may not use, sell, or lease cash collateral to pay ordinary operating expenses of the Property, or for any other purpose, unless either (1) the secured party consents to such use, or (2) the court authorizes such use after notice and a hearing. 11 U.S.C. § 363(c)(2). If the court permits the use of cash collateral, a secured creditor is entitled to adequate protection of its interest in cash collateral. 11 U.S.C. § 363(e); *In re Martin*, 761 F.2d 472, 475 (8th Cir. 1985). The Debtors bear the burden of proof to show adequate protection pursuant to 11 U.S.C. § 363(p). *In re Pacific Lifestyle Homes, Inc.*, 2009 WL 688908, 8 (Bankr. W.D. Wash. 2009); see also *In re Cha Hawaii, LLC*, 426 B.R. 828, 837 (Bankr. D. Haw. 2010); *In re Energy Partners, Ltd.*, 409

B.R. 211, 236 (Bankr. S.D. Tx 2009); *In re American Consolidated Transportation Companies, Inc.*, 2009 WL 3571268, 1 (Bankr. N.D. Ill. 2009).

45.    Here, the Debtors propose as adequate protection (i) granting Lender replacement liens in the Debtors' assets, and (ii) expending Lender's cash collateral only for items set out in the Debtors' proposed Budget (as defined in the Motion), subject to a line-item variance of up to 15%. *See* Motion, at ⁋ 16(a)-(b). The Debtors' proposal does not amount to adequate protection.

### i.    The Property Does Not Cashflow

46.    Based upon the Receiver's review of books and records maintained during the receivership, the Fairfax Property generated a negative net operating income of (-$256,650.40), *before* accounting for any debt service owed to Lender, the $95,760.69 of capital expenditures required, or the millions of dollars' worth of deferred maintenance that remains outstanding. The Woodland Property generated a net operating income of just $48,199.27, which amount likewise does not reflect any payment of debt service obligations, the $368,051.44 in capital expenditures required, or millions in deferred maintenance. These figures belie the Debtors' assertion in their *Amended Emergency Motion for Turnover of Property of the Estate* (the "**Turnover Motion**") that the Property does "not suffer from a fundamental operating problem," Turnover Motion, at ⁋ 10, and instead make it clear that the Property will continue to deteriorate if the Debtors were left to their own devices.[5] *See In re LDN Corp.*, 191 B.R. 320, 324 (Bankr. E.D. Va. 1996) (denying debtor's request to use cash collateral where subject property would "suffer negative cash flows" and "[t]he debtor has no means to make adequate protection or regular monthly mortgage payments, other than through the utilization of the bank's own collateral").

---

[5] The Property's lack of cashflow also necessarily means Debtors could not provide adequate protection payments to Lender even if they had proposed doing so.

### ii. The Debtors Have No Equity Cushion in the Property

47.    A debtor's equity cushion in a secured lender's collateral may provide adequate protection if it is sufficient to provide for the entirety of the creditor's claim under 11 U.S.C. § 506(a). *In re Gallegos Research Group Corp.*, 193 B.R. 577, 585 (D. Colo. 1995) (citing *In re Helionetics, Inc.*, 70 B.R. 433, 440–41 (Bankr. C.D. Cal. 1987)). On the other hand, "[i]f the value cushion is small, . . . the equity cushion may be insufficient adequate protection." *In re Gallegos*, 193 B.R. at 585.

48.    Here, Lender is undersecured in the Property by almost $20 million. *See* Affidavit of Shawyan Ahmadian (the "**Ahmadian Affidavit**"), at ⁋⁋ 25-26, also submitted with Lender's Objections to Turnover (stating "the current aggregate as-is value of the Property is approximately $42,800,000" and "the total indebtedness owed to Lender under the Loan Documents . . . exceeds $61,000,000.00"). Because the Debtors have no equity cushion in the Property, Lender is not adequately protected for the Debtors' use of Lender's cash collateral. *In re Gallegos*, 193 B.R. at 585; *see also In re Cadwell's Corners P'ship*, 174 BR 744, 761 (Bankr. N.D. Ill. 1994) (finding no adequate protection in part because "there are no equity funds available to develop, stabilize or expand the productivity of the Property").

### iii. The Debtors' Proffered Replacement Liens Are Illusory

49.    A replacement lien on collateral on which a secured creditor already holds a perfected lien does not constitute adequate protection because such an offer provides nothing that the creditor does not already have. *In re Buttermilk Towne Center, LLC*, 442 B.R. 558, 565 (B.A.P. 6th Cir. 2010) (holding lender was not "adequately protected by a replacement lien on rents in which the lender has an independent security interest"); *In re Stearns Bldg.*, 1998 WL 661071 at * 4 (6th Cir. 1998) (denying cash collateral motion because "the record does not indicate that

Debtor possesses any unencumbered assets with which it can offer [the lender] adequate protection"). Rather, a replacement lien must represent real, ascertainable value, not merely a theoretical interest in property that may never materialize. *In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987) (finding adequate protection where debtor offered replacement liens on collateral proceeds *and* on other *unencumbered* regular monthly income); *compare In re Kloubec*, Case No. 99–02325–C, 2000 WL 150837 at *5 (Bankr. N.D. Iowa, Jan. 11, 2000) (replacement lien on livestock "who existence cannot be verified" did not constitute adequate protection) *with In re Gerke*, 634 B.R. 104, 120 (D. Colo. 2021) (replacement lien on future crops and livestock constituted adequate protection where debtor had materially improved lender's cash collateral position over life of loan and "continued . . . operations, in accordance with a restricted budget" did not "threaten to erode the Bank's prepetition position").

50.    Here, the Debtors propose granting Lender replacement liens in the Debtors' assets. Motion, at ¶ 16(b). But the Debtors' proposal is meaningless because Lender already has a valid, perfected lien on and security interest in all of the Debtors' property under Section 1.1 of the Mortgage. In other words, not only do the Debtors propose granting to Lender something Lender already has, but the Debtors' proposed replacement collateral is simply the future Rents generated by Lender's current collateral, which, again, already belong to Lender under the Mortgage. *See* Motion, at ¶ 11 (speculating Debtors "will generate substantial tenant rent collections" if authorized to use Lender's cash collateral).

51.    Second, the record in the State Court Action, leading to the appointment of the Receiver, already indicates Lender's current collateral base is unstable, casting serious doubt on the Debtors' ability to effectively utilize Lender's cash collateral to materially improve Lender's current position. As set forth above, the Property's current operations cannot simultaneously

67564574_1                                                16

support repairs, debt service, and administrative and operating expenses, much less provide adequate protection. Because the Rents are insufficient even to preserve the value of Lender's present collateral, replacement liens on future Rents will not actually replace what is being spent. *Cf. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc's, Ltd.*, 484 U.S. 365, 370 (1988) (explaining protection of creditor's interest in collateral is not adequate unless proposed mechanism protects collateral from diminution in value during bankruptcy).

52.     Third, the Debtors' proffered replacement liens are entirely unnecessary in light of the functioning, pre-petition receivership that is in place. Because the Receiver already is competently administering the Property, there is no reason to substitute the Debtors' proffered replacement-lien regime for the existing receivership. The Receiver is already preserving the Property, maintaining segregated accounts, and using the Rents for the benefit of the Property under the State Court's supervision. Replacing that regime with the Debtors' proposed replacement liens would actually diminish—not enhance—the Lender's protection.

53.     Finally, the Debtors' proposed order (the "**Proposed Order**") does not include a Section 507(b) superpriority claim. Section 507(b) grants superpriority to administrative expenses incurred in preserving the estate "arising from a failure of adequate protection." *In re McLeod*, 205 B.R. 76, 79 (Bankr. E.D. Tex. 1996). Section 507(b) in other words operates as a "'statutory failsafe' to reimburse creditors where there is a shortfall in adequate protection." *In re Callister*, 15 B.R. 521, 529 (Bankr. D. Utah 1981). The Proposed Order calls the replacement liens "partial adequate protection," gives them only to the extent of any decrease in cash collateral, and excludes Chapter 5 causes of action. If the court authorizes any use of cash collateral, the order should grant to Lender a § 507(b) superpriority claim for any failure of adequate protection.

67564574_1                                                    17

**C.**     <u>The Debtors Have Already Grossly Mismanaged the Property, Resulting in Appointment of the Receiver</u>

54.     The Debtors have already proven their inability to adequately protect Lender's interest not only in cash collateral but also the rest of the Property from a decrease in value by, among other things, allowing the Property to deteriorate to such an extent that more than $450,000 of capital expenditures, along with millions of dollars of deferred maintenance, remain necessary to stabilize the Property and make it fit for service. *See* Shefman Decl., at ⁋⁋ 12, 16.

55.     With the Receiver already collecting rents, paying operating expenses, and otherwise maintaining and stabilizing the Property, there is no reason for the Debtors to completely uproot and divest the Receiver, and cause all of the significant disruption that comes with that drastic measure. The Debtors' instant Motion, along with the Motion for Turnover, appear to be nothing more than an attempt to circumvent the receivership (that the Debtor consented to) and regain control of the Property.

**D.**     <u>Debtors' 13-Week Cash Collateral Budget Proves Lender Is Not Adequately Protected</u>

56.     The 13-Week Cash Collateral Budgets for the Fairfax Property and the Woodland Property (together, the "**Budgets**") show nothing but continuing operating deficits, depletion of cash, exclusion of major capital expenditures, and no realistic chance of generating future Rents that would be sufficient to compensate Lender for the use of cash collateral now, much less to cover Debtors' debt service obligations, fund necessary capital expenditures and deferred maintenance, and otherwise competently administer the Property. Indeed, rather than establishing Lender's interest is adequately protected, the Budgets confirm continued administration by the Receiver is necessary to preserve the Property and protect creditors.

67564574_1                                     

57.    First and foremost, the Budgets demonstrate the Property is cashflow negative. The Budgets project total collections for the Fairfax Property of $733,652[6] and total disbursements of $1,005,078, for a net cash deficit of ($271,426). Likewise, the Budgets project total collections for the Woodland Property of $929,383[7] and total disbursements of $1,328,563, for a net cash deficit of ($399,180). In other words, the Debtors' own projections admit they intend to spend approximately $670,000 more than they expect to collect during the budget period, strongly indicating the Debtors' cannot fund ordinary operations over the budget period without exhausting available cash. This strongly undermines any contention that Lender is adequately protected. *In re LDN Corp.*, 191 B.R. at 324 (denying debtor's request to use cash collateral where subject property would "suffer negative cash flows" and "[t]he debtor has no means to make adequate protection or regular monthly mortgage payments, other than through the utilization of the bank's own collateral").

58.    The Budgets also openly assume the Debtors will not receive any debtor-in-possession ("**DIP**") financing, will sell no assets, and will make no capital contributions. Instead,

---

[6] Compounding the issue even more, the Budgets also contain inaccurate and unrealistic assumptions that vastly overinflate collections.  For example, the Budget for the Fairfax Property lists $189,000 in monthly rental revenue, whereas the actual rental revenue generated by the Fairfax Property is approximately $125,000 per month. Shefman Decl., at ⁋ 13. Furthermore, the Budget for the Fairfax Property assumes $212,554 in collections of past due accounts receivable for unpaid rent from tenants, however, the Receiver does not anticipate collections of past due balances from tenants, as most all of the non-paying tenants have already been evicted. Shefman Decl., at ⁋ 15.

[7] The Budget for the Woodland Property lists $308,000 in monthly rental revenue, whereas the actual rental revenue generated by the Woodland Property is approximately $260,000 per month. Shefman Decl., at ⁋ 13. Furthermore, the Budget for the Woodland Property assumes $79,831 in collections of past due accounts receivable for unpaid rent from tenants, however, the Receiver does not anticipate collections of past due balances from tenants, as most all of the non-paying tenants have already been evicted. Shefman Decl., at ⁋ 15.

the Debtors simply run out of money, further establishing the Debtors possess no realistic ability to stabilize the Property.

59.     Next, the Budgets have a line item for "term debt" totaling $340,899 for the Fairfax Property and $761,290 for the Woodland Property over the 13-week budget period, but the Debtors do not delineate the proposed recipient(s) of those payments. As set forth above, there is at least one additional secured creditor of Debtors—YSA—with an interest in the Property. For all Lender can tell, the Debtors are proposing the use Lender's cash collateral to make debt service payments to other creditors. This alone is grounds to find the Budgets do not provide adequate protection. *In re Atrium Dev. Co.*, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) (denying cash collateral motion where "[t]he debtor has not presented a budget, and the operating expenses are already being paid by the creditor. . . . The court can only surmise that the debtor seeks authorization to use cash collateral to pay its attorney fees or to make mortgage payments on the second deed of trust."). What is more, although Lender has already accelerated the Loan, meaning the entire balance is currently due, Debtors' monthly interest-only payment would be $566,026 per month, if the Loan were still in good standing. As such, the Debtors' proposed "term debt" line item is far from sufficient to cover debt service payments to Lender, suggesting the Debtors are proposing to use Lender's cash collateral to pay other creditors.

60.     Similarly, although the Budgets contain a line item for adequate protection payments, the proposed amount is $0. The complete absence of adequate protection payments is just one more indication that the Debtors cannot adequately protect Lender for the use of cash collateral. *In re Gallegos*, 193 B.R. at 585 ("Where a debtor desires to use cash collateral, a court must determine the value of the creditor's interest in the cash collateral and whether the debtor's proposed use of cash collateral would impair that interest.").

67564574_1                                      20

61.     Next, the Budgets improperly devote cash collateral to management fees and restructuring professionals, with no indication as to how these expenses protect Lender or are necessary expenses for the benefit of the estate. Indeed, the Debtors' proposed payment of management fees from Lender's cash collateral is doubly concerning in light of the serious allegations against Kulick set forth in the Upperman Complaint. In light of the Debtors' abject lack of transparency in the Budgets, neither Lender nor this Court can be sure Debtors are not proposing funneling Lender's cash collateral to Kulick. *See In re Visicon Shareholders Trust*, 478 B.R. 292, 312 (Bankr. S.D. Ohio 2012) (dismissing Chapter 11 case in light of debtor's repeated unauthorized use of secured lender's cash collateral to pay personal expenses of insiders); *In re Shivshankar P'ship LLC*, 517 B.R. 812, 826 (Bankr. E.D. Tenn. 2014) (holding debtor's failure to offer any form of adequate protection precluded debtor from using cash collateral for payment of attorney fees).

62.     Several other assumptions in the Budgets are entirely unrealistic. First, the Budgets list U.S. Trustee fees as $0, but Chapter 11 quarterly fees are due for each quarter or portion of a quarter and are calculated from disbursements. 28 U.S.C. § 1930(a)(6). With projected disbursements over $2.3 million combined, budgeting $0 for U.S. Trustee fees materially understates projected cash requirements and indicates the unserious nature of the Budgets overall.

63.     Second, the Budgets include only $23,933 for maintenance at the Fairfax Property and $53,710 for maintenance at the Woodland Property, while excluding turnover/capital costs altogether. By contrast, the Receiver has already incurred $95,760.69 in capital expenditures for the Fairfax Property and $368,051.44 in capital expenditures for the Woodland Property in just four (4) months since his appointment, and he estimates a total of at least $6,100,000.00 in immediate short term repairs and capital needs. The Debtors' blatant omission of these crucial line

items is just one more indication that the Debtors will do nothing but permit the Property to continue to deteriorate and cannot adequately protect Lender for the use of Lender's cash collateral.

64.      Third, the Budgets assume complete collection of projected billings (over a four-week period) and further assume substantial recovery of aged accounts receivable. At the Fairfax Property, for example, the assumptions themselves recognize that the projected recovery of more than $212,000 in existing accounts receivable is a "key sensitivity" and that slower collections will drive the Property into an even greater cash deficit. However, the Receiver has revealed that he does not anticipate significant collections of past due rent accounts receivable, as most all of the tenants that were not paying rent have already been evicted. Shefman Decl., at ℙ 15. Thus, the Budgets rely on optimistic collection assumptions while simultaneously projecting that both Properties will exhaust available cash before the end of the 13-week period. This is not sufficient to carry the Debtors' burden to show adequate protection. *Cf. In re Atrium*, 159 B.R. at 471 (denying cash collateral motion in light of substantial uncertainty as to whether tenant occupying 90% of the premises would renew lease).

65.      Finally, the Debtors' proposed 15% line-item variance in the Budget is too large of a spread and exceeds the market standard rate of 10%.

**E.      The Debtors Cannot Use Cash Collateral for Professional Fees**

66.      The Debtors' Motion seeks authority to use cash collateral in part to pay the fees and expenses of its professionals in the course of the Debtors' reorganization efforts. A debtor's use of cash collateral to pay professional fees is permissible only when the secured creditor's interest is adequately protected. *See In re Ranch Partners, Ltd.*, 146 B.R. 833, 836 (D. Colo. 1992) ("If . . . the debtor has not established that the value of the secured assets is more than the secured creditor's claim, the debtor's attorney fees cannot be paid at the expense of the secured creditor.").

67.     As set forth above, Lender is undersecured in the Property by nearly $20 million. Ahmadian Aff., at ¶¶ 25-26. Given that Lender is undersecured and the Property does not cashflow, Debtor is not entitled to a carveout for professional fees from the proceeds of Lender's collateral. *In re Ranch Partners, Ltd.*, 146 B.R. at 836; *see also In re Am. Res. Mgmt. Corp.*, 51 B.R. 713, 719 (Bankr. D. Utah 1985). The Court accordingly should not authorize Debtor to use cash collateral to pay its professional fees.

### F.     The Interim Relief that the Debtors Seek Is Too Broad

68.     Federal Rule of Bankruptcy Procedure Rule 4001(b)(2) permits this Court to authorize interim use of cash collateral before conducting a final hearing. "During the initial stages of a bankruptcy, cash collateral orders should be confined to meet emergency expenses." *Bankwest, N.A. v. Todd*, 49 B.R. 633, 636 (D. S.D. 1985). Rule 4001 permits interim use of cash collateral only as "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Rule 4001(b)(2)(A). Further, a court may authorize the interim use of cash collateral "only if there is a reasonable likelihood that the trustee [or debtors-in-possession] will prevail at the final hearing." *Id*. at 634 n.2 (quoting 11 U.S.C. § 363(c)(3)).

69.     Here, the Debtors seek approval of 13-week Budgets that include debt service, management fees, and restructuring/professional fees, not just emergency operating expenses. These requests exceed the scope of appropriate relief under Rule 4001. *Bankwest*, 49 B.R. at 636. The Debtors rather appear to be attempting to bypass the framework of Rule 4001 in the hope of securing final approval without having to carry their burden to show the immediate use of Lender's cash collateral is "necessary to avoid immediate and irreparable harm." Rule 4001(b)(2)(A). At minimum, the Court should deny final approval of the Debtors' request to use cash collateral and narrowly tailor any relief granted to provide only for payment of essential current operating expenses, excluding professional fees, excessive management fees, affiliate or insider payments,

prepetition arrears, and any "Term Debt" line item that does not constitute an adequate protection payment to Lender. *See Matter of Hamlin's Landing Joint Venture*, 77 B.R. 916, 923 (Bankr. M.D. Fla. 1987) (permitting interim use of cash collateral "the limited extent it is necessary to maintain the operation").

### G.   The Debtors' Proposed Limitations Are Overbroad

70.   Consistent with common Chapter 11 practice, cash collateral orders often require weekly budgets and weekly variance reporting in Chapter 11 cases. Here, the Budgets propose to provide only monthly variance reports due twenty (20) days after the close of each month. Such reporting is insufficient to provide Lender with meaningful adequate protection. Cash collateral orders in commercial Chapter 11 cases routinely require weekly budget-to-actual reporting precisely because a 13-week cash flow forecast is intended to serve as a weekly monitoring tool. The Debtors' proposed Budgets deprive Lender of any meaningful opportunity to identify deteriorating operating performance or unauthorized expenditures until nearly seven weeks after commencement of the budget period, by which time substantial additional cash collateral could have been expended. Given the existing receivership, the pending turnover dispute, the Debtors' history of mismanagement, and the Debtors' own projections that the Property will operate at substantial cash deficits, monthly reporting twenty days in arrears does not provide the transparency necessary to adequately protect Lender's cash collateral. At a minimum, Lender would demand that any interim cash collateral order (i) require the Debtors (a) to provide weekly reporting within 2 business days, and (b) to maintain a blocked account or lender-monitored DIP account, (ii) provide that any unauthorized transfers or commingling of funds constitutes an immediate default under the order, and (iii) authorize Lender to immediately terminate any authority to use cash collateral upon the Debtors' default under the order.

67564574_1

24

**H.**     **The Budgets Do Not Adequately Segregate and Account for Cash Collateral.**

71.     Section 363(c) of the Code requires a debtor-in-possession to "segregate and account for any cash collateral in the [debtor-in-possession]'s possession, custody, or control." 11 U.S.C. § 363(c)(4). "Segregation of cash collateral, including rents in which a creditor has a security interest, is mandatory under the statute." *In re Rebel Rents, Inc.*, 307 B.R. 171, 182 (Bankr. C.D. Cal. 2004). Segregation is important before it permits creditors "to identify cash proceeds to maintain an interest in such proceeds." *Id*. The duty to segregate applies to all cash collateral, including rental income in which a mortgagee holds a security interest. *In re Cerrico Realty Corp.*, 127 B.R. 319, 325 (Bankr. E.D.N.Y. 1991).

72.     The Debtors' proposed Budgets do not satisfy this statutory obligation. The Budgets fail to reconcile the cash collateral actually in existence as of the Petition Date or otherwise permit Lender or this Court to trace the disposition of Lender's cash collateral. The Budgets derive their "Beginning Cash Balance" for each Property from the Receiver's March 31, 2026 balance sheet, but do not reconcile the Receiver-held cash as of the Petition Date, identify the amount of postpetition rents actually collected through the present, account for any postpetition disbursements already made by the Receiver, or distinguish between prepetition cash, postpetition rents, and other cash collateral. Likewise, because the Fairfax Debtors and the Woodland Debtors own their respective pieces of the Property as tenants-in-common, the Budgets do not identify whether any transfers of cash have occurred or may occur among the Debtors, nor do they demonstrate that each Debtors' cash collateral will be maintained in segregated accounts and used solely for that Debtors' obligations. Instead, the Budgets merely present aggregated cash flow projections without the accounting necessary to permit Lender to trace, verify, and monitor its cash collateral as required by Section 363(c)(4). Under these circumstances, Debtors' Budgets fail to establish Lender's cash collateral will be properly segregated and accounted for.

### I.      Lender Needs Clear Default Rights

73.      Finally, any order authorizing the Debtors' use of Lender's cash collateral must clearly define the events constituting a default (each an "**Event of Default**") under the order and the rights and remedies available to Lender upon the occurrence of an Event of Default. As proposed, the Debtors' Motion contains no meaningful enforcement mechanism in the event the Debtors exceed the approved budget, fail to provide required reporting, misappropriate, comingle, or otherwise misuse cash collateral, fail to maintain insurance, fail to comply with the terms of the cash collateral order, or otherwise fail to provide Lender with the adequate protection required by Sections 361 of the Bankruptcy Code. Absent clearly defined default provisions, Lender would be required to incur additional delay and expense seeking emergency relief while its cash collateral continues to be expended, undermining the very purpose of adequate protection.

74.      At a minimum, any cash collateral order should expressly provide that, upon the occurrence of a default thereunder (including, without limitation, any material budget variance, unauthorized use of cash collateral, failure to timely provide required financial reporting, failure to maintain insurance, failure to comply with the approved budget, or any other material breach of the order) Lender shall be entitled to immediately terminate Debtors' authority to use cash collateral and pursue all rights and remedies available under the Loan Documents, and applicable law, including, without limitation, seeking relief from the automatic stay, prohibiting further use of cash collateral, enforcing its liens against the Property, and seeking such other relief as the Court deems appropriate. Without clearly delineated default rights and remedies, any cash collateral order would fail to adequately protect Lender's interest in its cash collateral.

### J.      Reservation of Rights

75.      Lender reserves any and all rights, including the right to raise additional arguments, alter the above arguments, to seek additional adequate protections at any time, including after the

67564574_1                                   26

entry of any initial order granting Debtors' use of Lender's cash collateral, or file a motion to dismiss or motion for stay relief.  The failure to make any argument in this Objection should not be construed as a waiver of any additional arguments or rights or Lender's ability and right to raise such at a later date, including at any hearing regarding cash collateral or in a subsequent pleading objecting to future interim or final approval of cash collateral.  For avoidance of doubt, nothing stated herein should be construed as an affirmative statement by Lender as to the value of its cash collateral, or any other collateral or asset of the Debtors, and Lender reserves all rights relating to the valuation of such.

76.     The Debtors bear the burden of proving Lender's cash collateral is adequately protected. The Debtors have failed to carry that burden. The record demonstrates the Receiver is already preserving and administering the Property, the Debtors' proposed replacement liens provide no meaningful additional protection, the Budgets project continuing operating deficits and depletion of cash, and the proposed cash collateral procedures lack the reporting, segregation, and enforcement mechanisms necessary to protect Lender's interest. Accordingly, the Court should deny Motion.

WHEREFORE, Lender asks this Court to deny the Debtors' Motion and for such other relief as the Court deems just and proper.

Respectfully submitted,


*/s/ Kiran A. Phansalkar*
Kiran A. Phansalkar, OBA #11470
Preston M. Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
McAfee & Taft
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, OK  73102-7103
Telephone:  (405) 235-9621
Email:  kiran.phansalkar@mcafeetaft.com
        preston.sullivan@mcafeetaft.com
        beth.attaway@mcafeetaft.com

-and-

Nicholas A. Griebel
(*pending admission pro hac vice*)
POLSINELLI PC
7676 Forsyth Boulevard, Suite 800
St. Louis, Missouri 63105
Telephone:  (314) 622-6613
Email:  ngriebel@polsinelli.com
***Attorneys for Saperean Capital***
***IV TB Note Lender KD4, LLC***

67564574_1

28

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2026, I electronically transmitted this filing to the Clerk of the Court using the ECF system for filing and transmittal of Notice of Electronic Service to the ECF registrants of record.

*/s/ Kiran A. Phansalkar*
Kiran A. Phansalkar